OHANNES ASLANIAN *vs.* HAGOP DOSTUMIAN & another.

Worcester.    October 2, 1899. — October 18, 1899.

Present: HOLMES, C. J., KNOWLTON, LATHROP, BARKER, & LORING, JJ.

*Draft — Prevalence of Law Merchant in Turkey in Asia — Presumption — Collateral Contract.*

In an action to recover the equivalent of money paid by the plaintiff to the defendant for a draft in favor of a third person payable in Turkey in Asia, the plaintiff's evidence being that it was agreed orally at the time when the draft was purchased, that if it was not paid the money should be returned, and it appearing that the drawee refused to pay, but the draft was not protested, there is no presumption that in that country the custom as to protest is the same as it is here, as bearing on the probable construction of the collateral contract relied on by the plaintiff.

CONTRACT, for money had and received. At the trial in the Superior Court, before *Hopkins,* J., the jury returned a verdict for the plaintiff; and the defendants alleged exceptions. The facts appear in the opinion.

*W. S. B. Hopkins & G. S. Taft,* for Dostumian.

*J. R. Kane,* for the plaintiff.

HOLMES, C. J.   This is an action to recover the equivalent of money paid by the plaintiff to the defendants for a draft in favor of a third person, payable at Harpoot in Turkey in Asia. The plaintiff's testimony was that it was agreed orally at the time when the draft was purchased that if it was not paid the money should be returned.   The drawees refused to pay, but the draft was not protested.   In his charge to the jury, the judge stated that he could not say whether or not the law merchant prevailed in Turkey; that there was no evidence whether it did or not; and that it would not necessarily govern unless the jury found that the parties expressly agreed that it should. To these statements the defendants excepted.

The plaintiff was a stranger to the draft.   He based his rights upon a collateral agreement.   Whether that agreement was an out and out promise to refund if the draft was not paid, or only a promise to do so if all steps were taken to charge the drawers, which are customary in this part of the world, depended on what the parties saw fit to say.   There was no presumption about it one way or the other.   This seems to have been the judge's view, for after the remarks excepted to he went on to say that the plaintiff put his case upon the theory that the contract was entirely inconsistent with the notion that his rights were dependent upon protest or the law merchant, and he left it to the jury whether the plaintiff had proved such a contract.

In view of the nature of the case, it may be that the judge meant no more than to make a collateral remark which he regarded as immaterial, that he did not know whether the law merchant did or did not prevail in Turkey in Asia, as a preliminary to telling the jury that the question before them was what kind of a contract, if any, the parties had made in fact. There was no evidence that anything was said about protest or notice; and if the jury found a contract, as they did, it would be going pretty far to let them read into the simple words, "if the Dr. Bagdasarian wont pay in Harpoot you bring those checks, we give you the money back again," — a limitation which made the plaintiff's rights in Worcester dependent upon the conduct of a stranger, an Armenian, who was in a remote and disturbed part of Asia, and over whom the plaintiff

had no control. The very fact that the drawers contemplated
the possibility of a refusal to pay looks the other way. If the
ground of refusal was true, that the drawers had no assets in
the drawees' hands, it may be that they were not entitled to
proof of demand and notice. *Kinsley* v. *Robinson,* 21 Pick.
327. *Pierce* v. *Indseth,* 106 U. S. 546, 551. And upon the
whole the natural interpretation would be that if the drawees
refused to pay the plaintiff was to have his money back with-
out further condition than the surrender of the draft. The
draft was tendered to the defendants by the plaintiff.

At all events it is clear that under the instructions the jury
could not have found for the plaintiff unless they found such
a simple unqualified promise, and therefore the question does
not arise whether the remarks excepted to would have been
correct if the promise had been only to be liable to the plain-
tiff according to the tenor of the draft.

If, however, in view of the contract having been voluntarily
proposed by the defendants as incident to the sale of the draft,
it should be argued that the jury would have been warranted
in finding that the contract did not purport to enlarge the
extent of the defendants' liability, and that from that point
of view their finding conceivably might have been affected by
the consideration that our law of protest did or did not pre-
vail at Harpoot, and so that what the judge said was material
in this aspect of the case, it is to be noticed that no such sug-
gestion was made, even in the argument before us, and that it
is evident that no such suggestion was in the mind of any one
at the trial. It rather looks, on the contrary, as if no one
had kept in mind distinctly that the suit was neither upon the
draft nor by a party to it.

If notwithstanding the foregoing considerations we come to
the correctness of the judge's statement and treat it as imply-
ing what he did not say, that the jury had no right to presume
that the law of Harpoot was similar to ours, we are not pre-
pared to say that he was wrong. It will be observed that the
question is not whether the drawer in Massachusetts by impli-
cation stipulated in his draft for notice of non-payment, or any
question as to notice, but a naked question whether it could
be presumed that in Harpoot the custom as to protest was the

same as ours, as bearing on the probable construction of the collateral contract with the plaintiff.

No doubt devices for the transfer of debts or values without an actual transport of money or goods may have been contrived at different places and at different times. They may be as old as commerce. But it cannot be assumed that they always have taken the same form. There is a presumption that the common law as we understand it is the common law, and often, if not always, that it is the law of other common law States; but there is no presumption that it prevails all over the world. *Savage* v. *O'Neil*, 44 N. Y. 298, 300, 301. *Owen* v. *Boyle*, 15 Maine, 147. *Flato* v. *Mulhall*, 72 Mo. 522. 2 Stark. Ev. (4th Am. ed.) 568. Wharton, Ev. §§ 314, 315, 1292. There is no such presumption as to the so-called law merchant taken as meaning substantive law. The law merchant in this sense is merely a vaguely defined portion of the common law, or, in its widest interpretation, of the law of European countries, having the Roman and the Frankish law for its parents. See Smith, Merc. Law, (10th ed.,) Introduction; 2 Selden Soc. Pub. 132 *et seq.*; Gundermann, Eng. Privatrechts, 84. Our law of negotiable paper has no orthodox sanction of having been accepted *semper ubique et ab omnibus*. Like the rest of our law, it has had a strictly European origin and history, which are tolerably well known. See Brunner, Forschungen, 524, 631; 1 Heusler, Inst. des Deutsch. Privatrechts, 212, 213, 375; 9 Law Quarterly Rev. 70. It is not to be presumed that either the Roman or Frankish law shaped the native law of Turkey. Still less is it to be presumed that Massachusetts modes of dealing with details prevail there when they notoriously vary even in European countries. In Spain, if we may trust *Horne* v. *Rouquette*, 3 Q. B. D. 514, no notice of dishonor is necessary in order to enable the holder to have recourse to an indorser.

There is no need to multiply illustrations. If, as would seem from some of the text-books and encyclopædias, the European law of negotiable paper is known in Turkey, it is by recent legislative adoption or imitation of the French Code de Commerce, and the fact ought to be proved by the party who wishes to profit by it. Whether protest is necessary upon such an instrument as the draft in this case, and even whether an

acceptance of it would be recognized as valid under the supposed Turkish Code, is to be settled not by presumption, but by proof.                              *Exceptions overruled.*